UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | |
|---|---|
| RONALD ALVERSON<br>and SCS CARBON TRANSPORT LLC,<br><br>      Plaintiffs,<br><br>  v.<br><br>SPINK COUNTY, SOUTH DAKOTA;<br>SPINK COUNTY BOARD OF<br>COMMISSIONERS;<br>BRETT KNOX, in his official capacity<br>as a Spink County Commissioner;<br>BRIAN JOHNSON, in his official<br>capacity as a Spink County<br>Commissioner;<br>DUSTIN RISCHE, in his official<br>capacity as a Spink County<br>Commissioner;<br>SUZANNE SMITH, in her official<br>capacity as a Spink County<br>Commissioner; and<br>DAVE ALBRECHT, in his official<br>capacity as a Spink County<br>Commissioner,<br><br>      Defendants. | No. 22-3023<br><br>**COMPLAINT** |

## INTRODUCTION

1. The Eighth Circuit has repeatedly held that federal law preempts state and local governments' efforts to impose their own standards on federally regulated pipelines. *See ANR Pipeline Co. v. Iowa State Com. Comm'n*, 828 F.2d 465 (8th Cir. 1987); *Kinley Corp. v. Iowa Utils. Bd.*, 999 F.2d 354 (8th Cir. 1993); *cf. N. Nat. Gas Co. v. Iowa Utils. Bd.*, 377 F.3d 817 (8th Cir. 2004). Now, ignoring those rulings,

Spink County seeks to impose its own standards on an interstate pipeline. But its effort is preempted, invalid, and unenforceable.

2. Plaintiffs Ronald Alverson and SCS Carbon Transport LLC ("SCS" for short) bring this action seeking declaratory and injunctive relief against the enforcement of Spink County's moratorium on pipeline permitting and construction and regulation of pipeline safety. The moratorium violates and is preempted by the federal Pipeline Safety Act and the Supremacy Clause of the U.S. Constitution because it impermissibly regulates safety aspects of SCS's planned carbon dioxide pipeline.

## PARTIES

3. Plaintiff Ronald Alverson is a citizen and resident of Lake County, South Dakota.

4. Plaintiff SCS Carbon Transport LLC is a limited liability company organized under Delaware law with its principal place of business in Ames, Iowa. SCS is authorized and in good standing to transact business in South Dakota.

5. Defendant Spink County, South Dakota is a county and body corporate under the laws of South Dakota.

6. Defendant Spink County Board of Commissioners is the board of commissioners and governing body for Spink County under the laws of South Dakota.

7. Defendant Brett Knox is a commissioner on the Spink County Board of Commissioners and is a resident of South Dakota. Mr. Knox is sued only in his official capacity as a Spink County Commissioner.

8. Defendant Brian Johnson is a commissioner on the Spink County Board of Commissioners and is a resident of South Dakota. Mr. Johnson is sued only in his official capacity as a Spink County Commissioner.

9. Defendant Dustin Rische is a commissioner on the Spink County Board of Commissioners and is a resident of South Dakota. Mr. Rische is sued only in his official capacity as a Spink County Commissioner.

10. Defendant Suzanne Smith is a commissioner on the Spink County Board of Commissioners and is a resident of South Dakota. Ms. Smith is sued only in her official capacity as a Spink County Commissioner.

11. Defendant Dave Albrecht is a commissioner on the Spink County Board of Commissioners and is a resident of South Dakota. Mr. Albrecht is sued only in his official capacity as a Spink County Commissioner.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs' claim arises under federal law, including the Supremacy Clause, U.S. Const. art. VI, cl. 2.

13. This Court is authorized to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202 and Federal Rules of Civil Procedure 57 and 65.

14. Venue is proper in this Court under 28 U.S.C. § 1391(b) because all Defendants reside in this district and a substantial part of the events giving rise to Plaintiffs' claim occurred in this district.

## FACTUAL ALLEGATIONS

**Corn, Ethanol, and Carbon Dioxide in South Dakota**

15. Corn is one of South Dakota's top commodities by volume and the State's most valuable agricultural commodity. Last year, South Dakota produced corn worth more than $4.1 billion—which was $1.3 billion more than the State's next most valuable crop (soybeans).[1]

16. More than half of all corn harvested in South Dakota goes to ethanol production. In 2018, for example, the State produced 778 million bushels of corn, 396 million of which were used in ethanol production.[2]

17. And South Dakota is home to a significant percentage of the United States' ethanol production. In 2019, for example, the State's ethanol production accounted for approximately 8% of the Nation's total ethanol production.[3] Most of the ethanol produced in South Dakota makes its way outside of the State.

18. Corn's value in South Dakota—and throughout the Nation—is inextricably tied to ethanol production.

19. The value of ethanol, and thus the price of corn, is affected by state and foreign regulations that target carbon dioxide ($CO_2$) emissions.

---

[1] *See 2021 State Agriculture Overview*, U.S. Dep't of Agric., https://www.nass.usda.gov/Quick_Stats/Ag_Overview/stateOverview.php?state=south%20dakota (last visited Dec. 9, 2022).

[2] *See Ethanol Plants Use Over Half of SD Corn*, S.D. Cor Utilization Council & S.D. Corn Growers Ass'n (July 22, 2020), https://www.sdcorn.org/news/ethanol-plants-use-over-half-of-sd-corn.

[3] *See South Dakota State Energy Profile*, U.S. Energy Info. Admin., https://www.eia.gov/state/print.php?sid=SD (last updated June 16, 2022).

4

20. $CO_2$ is a byproduct of the fermentation process of producing ethanol from corn. $CO_2$ is not only a byproduct of ethanol plants but also a byproduct of numerous other manufacturing processes, including fertilizer ammonia production.

21. $CO_2$ is a greenhouse gas that poses environmental concerns if released into the atmosphere in large quantities.

22. Carbon capture and sequestration (CCS) is a process by which $CO_2$ is captured at the point of generation, transported, and then safely stored. CCS technology reduces greenhouse gas emissions by preventing the release of $CO_2$ into the atmosphere.

23. Carbon intensity measures the amount of carbon emitted per unit of energy consumed. Lower carbon emissions during fuel production result in a lower carbon intensity for that fuel.

24. Canada, for example, is a primary importer of ethanol from the United States, and South Dakota is one of the main sources of U.S. ethanol exports to Canada. In 2021, Canada imported approximately 1.3 billion liters of U.S. ethanol fuel—an 8% percent increase from 2020. Those imports are projected to reach a record 1.5 billion liters in 2022.[4]

25. Canada's increased demand for ethanol comes in part from recently enacted energy regulations that incentivize the production, sale, and use of low carbon intensity fuels. Canada's Clean Fuel Regulations (CFR), which became law in July 2022, impose a comprehensive set of fuel standards, including requirements that

---

[4] *See Canada: Biofuels Annual*, Report No. CA2022-0019, U.S. Dep't of Agric. (Aug. 22, 2022), https://www.fas.usda.gov/data/canada-biofuels-annual-8.

fuel suppliers progressively reduce the carbon intensity of fuels sold in Canada.[5] The CFR aims for a 15% decrease in the carbon intensity of gasoline and diesel used in Canada by 2030.

26.     Energy regulations target carbon emissions in the United States too, increasing in-state demand for low carbon intensity fuels. California, for example, has adopted the Low Carbon Fuel Standard (LCFS), which requires ongoing reductions in the carbon intensity of fuels sold in the State.[6] The LCFS considers emissions associated with the complete life cycle of fuel—from production to transportation to consumption. Under the LCFS, providers of low carbon intensity fuels generate credits. The value of those credits for ethanol plants has historically varied from $50–$200 per ton of $CO_2$ depending on demand.[7] And the California Air Resources Board recognizes CCS as "an important strategy to reduce greenhouse gas (GHG) emissions and mitigate climate change."[8]

27.     Oregon has adopted a similar approach.[9] Under its Clean Fuels Program, the State is targeting a 10% reduction in average carbon intensity from

---

[5] *See, e.g., What are the Clean Fuel Regulations?*, Gov't of Canada, https://www.canada.ca/en/environment-climate-change/services/managing-pollution/energy-production/fuel-regulations/clean-fuel-regulations/about.html (last updated July 7, 2022); *Compliance with the Clean Fuel Regulations*, Gov't of Canada, https://www.canada.ca/en/environment-climate-change/services/managing-pollution/energy-production/fuel-regulations/clean-fuel-regulations/compliance.html (last updated July 20, 2022).

[6] *See, e.g., Low Carbon Fuel Standard*, Cal. Air Res. Bd., https://ww2.arb.ca.gov/our-work/programs/low-carbon-fuel-standard (last visited Dec. 9, 2022).

[7] *See California Low Carbon Fuel Standard Credit Price*, Neste, https://www.neste.com/investors/market-data/lcfs-credit-price (last visited Dec. 9, 2022).

[8] *Carbon Capture & Sequestration*, Cal. Air Res. Bd., https://ww2.arb.ca.gov/our-work/programs/carbon-capture-sequestration (last visited Dec. 9, 2022).

[9] *See, e.g., Clean Fuels Program Overview*, Oregon.gov, https://www.oregon.gov/deq/ghgp/cfp/Pages/CFP-Overview.aspx (last visited Dec. 9, 2022).

2015 levels by 2025, a 20% percent reduction by 2030, and a 37% reduction by 2035. Fuel providers and importers must show that the volume and type of fuel supplied meet annual standards. And businesses can generate credits for fuels that exceed those standards.

28. Other states have enacted similar low carbon initiatives and regulations.

29. The value of South Dakota ethanol production, and the value of corn in South Dakota—and throughout the Nation—depends on, and will likely increasingly depend on, carbon-reduction efforts of South Dakota ethanol facilities.

**SCS's $CO_2$ Pipeline**

30. SCS and its parent Summit Carbon Solutions, LLC are developing an interstate $CO_2$ pipeline and related facilities to facilitate CCS technology. When completed, the pipeline will transport $CO_2$ captured from more than 30 facilities (primarily ethanol plants but also some fertilizer plants) across South Dakota, North Dakota, Iowa, Minnesota, and Nebraska. The pipeline system will transport this $CO_2$ through a network of more than 1,900 miles of underground pipes across those five states and deliver it to geologically appropriate sequestration sites in North Dakota.

31. SCS will provide its $CO_2$ transportation services to the public for hire as a common carrier.

32. In South Dakota, the pipeline project is projected to involve more than 450 miles of pipeline, transporting $CO_2$ from both out-of-state and in-state facilities, including Dakota Ethanol, LLC in South Dakota.

33. The pipeline will travel through 18 counties in South Dakota: Beadle, Brown, Clark, Codington, Edmunds, Hamlin, Hand, Hyde, Kingsbury, Lake, Lincoln, McCook, McPherson, Miner, Minnehaha, Spink, Sully, and Turner.

34. The pipeline project is underway. SCS is in the process of surveying the routes for the project and securing the necessary permits. It is also negotiating with landowners for land access.

35. In South Dakota, SCS is engaging with the State's Public Utilities Commission (PUC) as part of the planning and permitting for the pipeline project. On February 7, 2022, SCS filed an application with the PUC for the siting permit required for the pipeline under South Dakota law.[10]

36. The pipeline project will help reduce the carbon footprint and environmental impact of ethanol production by facilitating the transportation and sequestration of $CO_2$, thereby reducing its release into the atmosphere, which in turn will reduce the carbon intensity of and enhance the long-term economic viability of South Dakota's ethanol and agriculture industries.

37. Ethanol plants whose $CO_2$ byproduct is transported through SCS's interstate pipeline—including Dakota Ethanol—will be equipped to produce carbon-neutral fuel by 2030 and will be better positioned to compete in energy markets that prefer or require fuels with low carbon intensity, including the Canada, California, and Oregon markets discussed above.

---

[10] *See In the Matter of the Application by SCS Carbon Transport LLC for a Permit to Construct a Carbon Dioxide Transmission Pipeline*, Docket No. HP22-001 (S.D. Pub. Utils. Comm'n Feb. 7, 2022), https://puc.sd.gov/dockets/HydrocarbonPipeline/2022/HP22-001.aspx.

38. For example, through its use of SCS's pipeline, Dakota Ethanol expects to earn at least $15 million per year in low carbon premiums.

39. Accordingly, South Dakota ethanol plants—including Dakota Ethanol—have a direct interest and stake in the success of SCS's pipeline project.

40. Mr. Alverson is also directly interested in the pipeline's success. He and his family own a 2,200-acre farm in Lake County, South Dakota, which he rents to his son. The farm grows around 1,800 acres of corn for an average yield of 180–190 bushels per acre. All of the corn grown on Mr. Alverson's farm is sold to Dakota Ethanol for ethanol production.

41. In fact, Mr. Alverson is a founder of Dakota Ethanol, which operates its ethanol production facility in Lake County, South Dakota. Mr. Alverson also holds an ownership interest in the company.

42. Dakota Ethanol produces approximately 100 million gallons of ethanol per year. It has approximately 1,000 members, approximately 95% of which are from South Dakota and approximately 80% of which are corn producers.

43. Dakota Ethanol ships approximately 80% of its ethanol fuel to the California and Pacific Northwest markets. Because of the California and Oregon low carbon fuel standards and incentives, Dakota Ethanol has opportunities to sell its ethanol in those states at a premium if its ethanol meets the states' low carbon intensity standards.

44. Mr. Alverson also holds ownership interests in several other ethanol production facilities.

45. Accordingly, Mr. Alverson has a direct interest and stake in the success of SCS's pipeline project, both as a farmer and as a part-owner of several ethanol production facilities. The pipeline project will help facilitate the viability and competitive edge of ethanol fuel production and increase that production. Increased ethanol production will bring higher demand and higher prices for corn, financially benefiting Mr. Alverson and other corn farmers in the State. Moreover, the value of Mr. Alverson's ownership interests in those ethanol facilities is inherently tied to the increased viability and volume of ethanol production that will result from SCS's pipeline project.

**Spink County Resolution #22-24**

46. Even though the federal government regulates the safety of SCS's pipeline project (as discussed below) and SCS is engaging with the PUC about the project, several South Dakota counties have taken their own steps to regulate SCS's and others' pipeline projects, citing safety concerns.

47. One of those counties is Spink County. On July 19, 2022, the Spink County Board of Commissioners unanimously passed Resolution #22-24, which established a moratorium on new conditional use permits and building permits for hazardous waste pipelines. The safety of SCS's pipeline was one of the concerns raised before the passage of Resolution #22-24.

48. Resolution #22-24 states that "pipelines, particularly those requiring the approval of the South Dakota Public Utilities Commission, can impact the **health**, **safety**, and general welfare of a large portion of this County's population" (emphasis added).

49. Resolution #22-24 states that Spink County "has begun the process of compiling, studying, reviewing, composing, and siting performance standards that it believes are **necessary to safeguard the health, safety**, and general welfare of the public prior to the issuance of a hazardous waste pipeline conditional use permit" (emphasis added).

50. Resolution #22-24 states that "this Resolution **reflects a concern for the health, safety**, and welfare of Spink County" (emphasis added).

51. Resolution #22-24 invokes the authority of Title 17 of the Spink County Zoning Ordinances "in order to promote the **health**, **safety**, and general welfare of the County" (emphasis added).

52. Resolution #22-24 imposes "a temporary moratorium on the issuance of any and all permits, licenses, or approvals for the construction, installation, or use of any hazardous waste pipeline, particularly those pipelines requiring the approval of the South Dakota Public Utilities Commission, traversing those lands contained within the unincorporated areas of Spink County, South Dakota."

53. A true and accurate copy of the minutes that document the passage of Resolution #22-24 and that contain its text is attached as **Exhibit A**.

54. Resolution #22-24 is injuring Plaintiffs by preventing SCS from completing—or even beginning—the portion of the pipeline project in Spink County.

55. Because the main artery of the pipeline is planned to run through Spink County, the full interstate pipeline cannot be completed or placed into operation while Spink County's regulation remains in place.

**The Pipeline Safety Act**

56. Although Spink County, through its board of commissioners, seeks to regulate safety aspects of SCS's pipeline project, federal law already exclusively regulates interstate pipeline safety under the Pipeline Safety Act (PSA), 49 U.S.C. §§ 60101 *et seq.*

57. Congress enacted the PSA in 1994 "to revise, codify, and enact without substantive change," the Natural Gas Pipeline Safety Act of 1968 (NGPSA) and the Hazardous Liquids Pipeline Safety Act of 1979 (HLPSA). Pub. L. No. 103-272, 108 Stat. 745, preamble (1994). The PSA's purpose "is to provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities." 49 U.S.C. § 60102(a)(1).

58. Under the PSA, the U.S. Department of Transportation (DOT) is charged with "prescrib[ing] minimum safety standards for pipeline transportation and for pipeline facilities." 49 U.S.C. § 60102(a)(2). The PSA also provides that DOT "shall regulate carbon dioxide transported by a hazardous liquid pipeline facility" and "shall prescribe standards related to hazardous liquid to ensure the safe transportation of carbon dioxide by such a facility." 49 U.S.C. § 60102(i)(1). DOT's regulatory authority, in turn, is delegated to the Pipeline and Hazardous Materials Safety Administration (PHMSA). *See* 49 U.S.C. § 108(a), (f).

59. $CO_2$ is a "hazardous liquid" under the PSA. *See* 49 U.S.C. § 60101(a)(4).

60. Because SCS is engaged in the interstate pipeline transportation of hazardous liquid and the construction, development, and operation of interstate

hazardous liquid pipeline facilities, its project is subject to federal regulation under the PSA.

61. Under the PSA, "[a] State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation." 49 U.S.C. § 60104(c).

62. Through section 60104(c), the PSA "expressly preempts" any local government's "attempt to impose safety regulations" on interstate pipeline projects. *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 880 (9th Cir. 2006); *see also, e.g., id.* at 878 ("Federal preemption of the regulation of interstate pipeline safety in any other manner is manifest in the language of the PSA provision entitled 'Preemption.'"); *Kinley Corp.*, 999 F.2d at 359 ("Congress granted exclusive authority [through the HLPSA] to regulate the safety of construction and operation of interstate hazardous liquid pipelines to the Secretary of the Department of Transportation. This Congressional grant of exclusive federal regulatory authority precludes state decision-making in this area altogether and leaves no regulatory room for the state to either establish its own safety standards or supplement the federal safety standards."); *ANR Pipeline*, 828 F.2d at 470 ("Congress intended to preclude states from regulating in any manner whatsoever with respect to the safety of interstate transmission facilities. . . . [T]he NGPSA leaves nothing to the states in terms of substantive safety regulation of interstate pipelines, regardless of whether the local regulation is more restrictive, less restrictive, or identical to the federal standards.").

63. At least one South Dakota county has already recognized that local governments lack authority to regulate interstate pipeline safety. In April 2022, the Board of Commissioners for Hand County, South Dakota, unanimously passed Resolution 2022-15, which established a moratorium on the construction, installation, or use of any pipeline for the purpose of transmitting hazardous waste. But on July 5, 2022, the board voted to withdraw the moratorium, concluding that "the authority of the county is limited and the majority of law, rules and regulations rest with the PUC and the federal regulatory agencies."

## COUNT I
### (Supremacy Clause Preemption)

64. Plaintiffs reallege and incorporate by reference all allegations in the Complaint.

65. Under the Supremacy Clause, "the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. As a result, state and local laws, ordinances, and other regulations that conflict with federal law are "without effect." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981).

66. Spink County's Resolution #22-24 states that its purpose is to address safety aspects of pipelines, including SCS's pipeline project.

67. As such, Resolution #22-24 constitutes a "safety standard[ ] for interstate pipeline facilities or interstate pipeline transportation." 49 U.S.C. § 60104(c).

68. Resolution #22-24 is designed and serves to supplement and supplant the methods of regulating pipeline safety that Congress has established and delegated to DOT and PHMSA.

69. Resolution #22-24 purports to regulate within a field so pervasively occupied by federal law that any state or local regulation is precluded and excluded.

70. Resolution #22-24 violates the PSA, conflicts with the PSA, and stands as an obstacle to accomplishing Congress's full purposes and objectives.

71. The PSA therefore preempts Resolution #22-24—by express, field, and conflict preemption—rendering it invalid, unenforceable, and null and void.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court grant the following relief:

1. Under 28 U.S.C. §§ 2201 and 2022 and Federal Rule of Civil Procedure 57, declare that Spink County's Resolution #22-24 is preempted by the Pipeline Safety Act and is invalid, unenforceable, and null and void as applied to SCS's pipeline project;

2. Under Federal Rule of Civil Procedure 65, preliminarily and permanently enjoin Defendants from (i) enforcing or implementing Resolution #22-24, (ii) enforcing or implementing any other moratoriums or bans on the permitting, construction, or development of SCS's pipeline project, and (iii) enforcing or implementing any resolution, ordinance, moratorium, ban, or other regulation that purports or intends to regulate any safety aspect of SCS's pipeline project;

3. Award Plaintiffs their costs under Federal Rule of Civil Procedure 54 and any other applicable authority; and

4. Award such other and further relief as the Court deems appropriate.

DATED, this 12th day of December, 2022.

**MAY, ADAM, GERDES & THOMPSON LLP**

BY: __/s/ *Justin L. Bell*__
BRETT KOENECKE
JUSTIN L. BELL
CODY L. HONEYWELL
CASH E. ANDERSON
P.O. Box 160
Pierre, SD 57501-0160
(605) 224-8803
brett@mayadam.net
jlb@mayadam.net
cody@mayadam.net
cea@mayadam.net

BRIAN D. BOONE
(*pro hac vice forthcoming*)
MICHAEL R. HOERNLEIN
(*pro hac vice forthcoming*)
MATTHEW P. HOOKER
(*pro hac vice forthcoming*)
**ALSTON & BIRD LLP**
101 S. Tryon St., Ste. 4000
Charlotte, NC 28280
(704) 444-1000
brian.boone@alston.com
michael.hoernlein@alston.com
matthew.hooker@alston.com

*Counsel for Plaintiffs*

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Ronald Alverson and SCS Carbon Transport LLC

**(b)** County of Residence of First Listed Plaintiff: Lake County, SD
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
MAY, ADAM, GERDES & THOMPSON LLP
P.O. Box 160, Pierre, SD 57501-0160
(605) 224-8803

## DEFENDANTS
Spink County, South Dakota; Spink County Board of Commissioners; Brett Knox; Brian Johnson; Dustin Rische;

County of Residence of First Listed Defendant: _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane / [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability / [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability |  | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander |  | [ ] 820 Copyrights | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability / [ ] 368 Asbestos Personal Injury Product Liability |  | [ ] 830 Patent | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine |  | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | [ ] 840 Trademark | [ ] 460 Deportation |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle / [ ] 370 Other Fraud | **LABOR** | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability / [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act |  | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury / [ ] 380 Other Personal Property Damage | [ ] 720 Labor/Management Relations | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice / [ ] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise |  | [ ] 751 Family and Medical Leave Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
|  |  |  | [ ] 863 DIWC/DIWW (405(g)) |  |
|  |  |  | [ ] 864 SSID Title XVI | [x] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | [ ] 790 Other Labor Litigation | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights / **Habeas Corpus:** | [ ] 791 Employee Retirement Income Security Act |  | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting / [ ] 463 Alien Detainee |  | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment / [ ] 510 Motions to Vacate Sentence |  | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations / [ ] 530 General |  | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment / [ ] 535 Death Penalty | **IMMIGRATION** |  |  |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other / **Other:** | [ ] 462 Naturalization Application |  | [ ] 950 Constitutionality of State Statutes |
|  | [ ] 448 Education / [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions |  |  |
|  | [ ] 550 Civil Rights |  |  |  |
|  | [ ] 555 Prison Condition |  |  |  |
|  | [ ] 560 Civil Detainee - Conditions of Confinement |  |  |  |

## V. ORIGIN *(Place an "X" in One Box Only)*
- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
49 U.S.C. 60104; U.S. Const. art. VI, cl. 2

Brief description of cause:
Challenge to legality of county resolution under the Supremacy Clause

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE: Chief Judge Roberto A. Lange
DOCKET NUMBER: 3:22cv3018, 3:22cv3019

DATE _____ SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II. **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C, 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III. **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

V. **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

VI. **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

VII. **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.